## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### Northern Division

| | | |
|---|---|---|
| THE HILB GROUP OF INDIANA, LLC, | ) ) ) | Hon. |
| Plaintiff, | ) ) | Civil Action No. |
| v. | ) ) | |
| STEPHEN M. KOLAJA, | ) ) ) | |
| Defendant. | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff The Hilb Group of Indiana, LLC ("THG-IN" or "Plaintiff"), by counsel, sets forth the following as its Complaint against Defendant Stephen M. Kolaja ("Kolaja").

## INTRODUCTION

1.     This is an action to stop unfair competition by a skilled and experienced insurance broker.  In July 2019, Kolaja sold his membership interest in Owen Moore Insurance Agency, LLC ("OMIA"), including his customer accounts, relationships and goodwill, in exchange for more than $700,000.00.  In exchange, Kolaja agreed that he would "remain bound by the Covenant Not to Compete contained in . . . the [OMIA] Operating Agreement" for five years after the sale of his membership interest.  This covenant prohibits Kolaja from contacting OMIA's customers and

1

working for a competing insurance brokerage within fifty (50) miles of OMIA's offices until August 7, 2024. Yet, that is precisely what Kolaja is doing. Kolaja is brazenly competing within the restricted area and has launched a campaign of efforts to solicit the very customers for whom he was handsomely paid. THG-IN, as the successor in interest to OMIA, has lost, and continues to lose, business as a result of Kolaja's disregard for his contractual obligations. It thus has no choice but to seek redress from this Court to 1) enjoin Kolaja from continuing to flout his contractual obligations and 2) award damages for the injuries he has caused.

### PARTIES

2. THG-IN is a Delaware limited liability company and is a subsidiary of The Hilb Group, LLC ("THG"). THG-IN purchased substantially all of OMIA's assets on or around December 31, 2020 and is the legal successor to OMIA's rights to enforce OMIA's Operating Agreement against Kolaja.

3. THG-IN is authorized to conduct business in Michigan and does business in Michigan as Owen Moore Insurance Agency with offices located at 68 S. Huron Road, Linwood, MI 48634; 9899 Saginaw Street, Reese, MI 48757; and 110 N. James Street, Standish, MI 48658.

4. THG-IN's sole member is The Hilb Group Operating Company, LLC, which is a Delaware limited liability company.

5.     The Hilb Group Operating Company, LLC's sole member is THG, which is a Delaware limited liability company.

6.     THG's sole member is THG Intermediate, LLC, which is a Delaware limited liability company.

7.     THG Intermediate, LLC's sole member is THG Acquisition Company, LLC, which is a Delaware limited liability company.

8.     THG Acquisition Company, LLC's sole member is Harpoon Bidco, Inc., which is a Delaware corporation with its principal place of business in Virginia.

9.     Upon information and belief, Kolaja is a Michigan resident and domiciliary who resides and may be served with process at 5767 Willowbrook Drive, Saginaw, MI 48638.

10.    Kolaja is a skilled insurance broker with more than twenty-five (25) years of experience in providing insurance products and services.  Throughout his career, Kolaja has specialized in commercial, farm, and personal lines of insurance.

11.    Kolaja began his employment with OMIA on or around September 14, 2004.  On or around January 1, 2016, Kolaja—through his company Anchored Investments, Inc. ("Anchored")—purchased a twenty-five percent (25%) membership interest in OMIA.

3

12.     Kolaja worked for OMIA until June 24, 2019 when OMIA terminated his employment, and he repurchased the 25% membership interest he owned through Anchored.

## JURISDICTION & VENUE

13.     This action is brought in the United States District Court for the Eastern District of Michigan.

14.     This Court has subject matter jurisdiction pursuant 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000.00 (exclusive of interest and costs) and is between citizens of different states.

15.     The Court has personal jurisdiction over Kolaja because he is a resident of the State of Michigan.

16.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391 because Kolaja resides in this judicial district.

## FACTUAL BACKGROUND

### THG-IN's Business and Customer Relationships

17.     THG-IN is, among other things, in the insurance brokerage, administration, and consulting business.  THG-IN provides insurance products and services and serves a variety of customers, including commercial and farm clients, as well as individuals and families.  THG-IN provides a full range of insurance products and solutions tailored to meet its customers' needs.

4

18.     THG-IN's insurance specialists are experts in serving its customers' unique needs and providing insurance programs to meet its customers' specific circumstances.  THG-IN's licensed brokers assist clients in developing strategies and solutions to manage risks unique to their specific industries.  Generally, THG-IN renews policies with its customers on an annual or bi-annual basis.

19.     In part due to its cyclical nature, the insurance brokerage and consulting business is extremely competitive.  Success in the industry depends in large part on customer relationships and goodwill.  Once a customer discontinues its policy or consulting relationship with a particular broker, the customer is unlikely to return.

20.     Moreover, an agency's insurance brokerage and consulting business often is grown through referrals.  The loss of one customer's relationship has a ripple effect of harming the agency's future ability to grow and to compete in the marketplace.

### Kolaja's Relationship with OMIA

21.     Kolaja has been a licensed insurance broker for more than twenty-five (25) years and has specialized in commercial, farm, and personal lines of insurance. He began his employment with OMIA on or around September 14, 2004.

22.     On or around January 1, 2016, Kolaja—through his company Anchored—purchased a twenty-five percent (25%) membership interest in OMIA. After the purchase, Randal Moore ("Moore") owned the remaining seventy-five

5

percent (75%) membership interest in OMIA through his company, Owen Moore Agency, Inc.

23.     As a result of the purchase, Kolaja personally became a party to the Restated Operating Agreement of Owen Moore Insurance Agency, LLC (the "Operating Agreement) (attached as Exhibit 1).

24.     Customer relationships and goodwill are of the utmost importance in the insurance brokerage industry.   Accordingly, OMIA invested substantial resources into its leaders, brokers and other business producers to establish goodwill and strong relationships with customers.  Like other insurance brokerages, OMIA thus is vulnerable to brokers and other business producers who can leverage those relationships.

25.     Given the importance of client relationships and the competitive nature of the insurance brokerage industry, OMIA has a legitimate business interest in protecting its confidential information, relationships with customers and prospective customers, and customer goodwill.

26.     OMIA sought to protect its legitimate business interests against unfair competition from Kolaja if Anchored sold its membership interest in OMIA.

27.     Accordingly, Kolaja was required personally (and not solely through Anchored) to enter into and be bound by the Operating Agreement as a condition of Anchored purchasing a twenty-five percent (25%) membership interest in OMIA.

6

28.    To protect OMIA's legitimate business interests, the Operating Agreement contained a Covenant Not to Compete applicable to Kolaja personally, which provided:

> If Anchored sells, assigns, or transfers its membership interest in the Company to the Company, another Member, or to a third party, ***Kolaja agrees that he will not, for a period of five (5) years from the date of sale***, directly or indirectly, either alone or in association with others, for themselves or for any other person, firm, or company, either as a principal, agent, employee, manager, director, officer, member, stockholder, or in any other capacity, ***contact current customers of the Company or of Owen Moore, conduct, become engaged in, or interested in, any business the same or similar to the Company's business or Owen Moore's business, within a radius of fifty (50) miles from any Company or Owen Moore location.***

Operating Agreement, at ¶ 6.3(b) (emphasis added).

29.    Kolaja executed the Operating Agreement twice:  once in his capacity as the owner of Anchored, and once in his individual capacity with respect to the Covenant Not to Compete.   The latter signature noted: "Stephen M. Kolaja, personally agrees to be bound to the terms of Section 6.3, titled "Covenant Not to Compete." *Id.*, p. 18.

30.    After purchasing a membership interest in OMIA through Anchored, Kolaja also continued his employment with OMIA.  He held the position of Vice President and served in a business development role.  Kolaja's duties included managing OMIA's business, soliciting and brokering sales of insurance and other products to new and existing customers, selling and providing consulting services, managing existing customer relationships, and performing other services to grow

7

OMIA's business and ensure customer satisfaction.   As Vice President, Kolaja became familiar and developed and maintained relationships with many of OMIA's customers.

31.    As an OMIA employee, Kolaja focused his efforts on commercial and farm customers but also provided insurance products and services to individuals and customers in other industries.

32.    Kolaja's employment with OMIA ceased on June 24, 2019.   Even though OMIA had "cause" to terminate Kolaja's employment, OMIA elected to terminate Kolaja's employment without cause.   *See* Confidential Release Agreement (the "Release Agreement"), ¶ 2 (attached as Exhibit 2).

33.    Because OMIA chose to treat the termination as without cause, it exercised its right to purchase Anchored's membership interest in OMIA under Sections 12.1 – 12.4 of the Operating Agreement.

34.    To memorialize the cessation of Kolaja's employment and the sale of Anchored's membership interest, OMIA, Kolaja, and Anchored entered the Release Agreement.

35.    Under the Release Agreement, OMIA agreed to purchase Anchored's membership interest for $711,891.00 with payments to be made over a ten (10) year period "provided Mr. Kolaja meets and continues to honor the conditions contained ... in the Operating Agreement."   Release Agreement, at ¶ 2.

8

36.     In the Release Agreement, Kolaja acknowledged and agreed that he "is and will remain bound by the Covenant Not to Compete contained in Section 6.3 of the Operating Agreement, which shall remain in full force and effect according to its terms." *Id.*, at ¶ 7.

37.     Anchored sold its membership interest in OMIA on effective August 7, 2019.  The Operating Agreement's non-competition covenant is thus in effect until August 7, 2024.  Operating Agreement, at ¶ 6.3(b).

38.     OMIA has complied with all of its obligations under the Operating Agreement and the Release Agreement, including making all applicable payments to Anchored.

### THG-IN's Acquisition of OMIA and Efforts to Protect Its Investment

39.     Because of the highly competitive nature of its business, and THG and its affiliated entities, including THG-IN, frequently engage in strategic acquisitions to strengthen their position in the marketplace.  THG is primarily an acquisition company, which pays market consideration for its various insurance asset acquisitions.

40.     Customer relationships and goodwill are of the utmost importance in THG-IN's industry.  Accordingly, THG-IN invests substantial resources into its brokers and business producers to establish goodwill and strong relationships with

customers. This makes THG-IN vulnerable to brokers and other business producers who can leverage those relationships.

41. THG-IN has a legitimate business interest in protecting its confidential information, relationships with customers and prospective customers, and customer goodwill, including the confidential information, relationships and goodwill it acquired as a result of the OMIA acquisition.

42. To protect its interests, when THG-IN purchases an insurance brokerage, it protects its investment by making sure that the brokerage's current and former producers are subject to valid and enforceable restrictive covenants and that THG-IN can enforce those covenants. THG-IN protected its investment in OMIA in the same manner.

43. On or around December 31, 2020, THG-IN purchased substantially all of OMIA's assets through an Asset Purchase Agreement with OMIA, Moore, and Owen Moore Agency, Inc.

44. In the OMIA acquisition, THG-IN acquired all of OMIA's client accounts and relationships, including all insurance expirations and rights of renewal and all of the associated goodwill, confidential information, files, claim files, books, records, ledgers, correspondence, and other records.

45.     THG-IN's acquisition included Kolaja's entire former book of business for OMIA, including the goodwill associated with each of Kolaja's former OMIA customers.

46.     To protect its investment in OMIA and its legitimate business interests, THG-IN made sure that it acquired, and therefore could enforce, OMIA's restrictive covenant agreements with its employees and prior owners, including Kolaja.

47.     In the Asset Purchase Agreement, OMIA explicitly assigned to THG-IN any and all rights it had under any restrictive covenant agreements with its employees and prior owners, including OMIA's rights against Kolaja under the Operating Agreement.

48.     Immediately following the OMIA acquisition, THG-IN began integrating OMIA's business.   The integration process included transitioning OMIA's customer accounts to THG-IN.

49.     THG-IN continues to do business in Michigan under the name Owen Moore Insurance Agency.

50.     THG-IN continues to maintain OMIA's former offices located at 68 S. Huron Road, Linwood, MI 48634; 9899 Saginaw Street, Reese, MI 48757; and 110 N. James Street, Standish, MI 48658.

## Kolaja Violates His Non-Competition Obligations

51.     The non-competition covenant in Section 6.3(b) of the Operating Agreement remains in effect until August 7, 2024—five (5) years after Anchored sold its membership interest in OMIA.

52.     When Kolaja executed the Operating Agreement, he was fully aware of the non-competition obligation it imposed on him.

53.     When Kolaja executed the Release Agreement, he was fully aware that the non-competition provision of the Operating Agreement would remain in full force and effect for its entire term.

54.     At all times, Kolaja has remained fully aware of the non-competition obligations the Operating Agreement imposed on him.

55.     Non-competition covenants, such as the one in the Operating Agreement, are standard in the insurance brokerage industry, including between members of a limited liability company.

56.     Despite knowledge of his non-competition obligations under the Operating Agreement, Kolaja has intentionally and willfully violated them.

57.     Although he could have worked for an insurance brokerage outside the fifty (50) mile radius from THG-IN's (and OMIA's former) locations, Kolaja chose to work for Future—a competing insurance brokerage within the restricted area.



58.     Future is a direct competitor of THG-IN.  Like THG-IN, Future is in the insurance brokerage, administration, and consulting business.  Future competes with THG-IN for the same customers in the same geographic area.  Indeed, all three Future offices are located within fifty (50) miles from THG-IN's (and OMIA's former) Linwood and Reese locations.

59.     Kolaja works in Future's office located at 5580 State Street, Suite 1, Saginaw, Michigan 48603.  This office is located fewer than twenty-five (25) miles from the THG-IN (formerly, OMIA) Linwood office in which Kolaja previously worked.

60.     Kolaja's duties for Future include soliciting new customers for insurance products and services.  Like he did for OMIA, Kolaja focuses his efforts on commercial, farm, and individual customers.

61.     Kolaja has directly violated his non-competition obligations.

62.     In addition, Kolaja has solicited, and continues to solicit, THG-IN's customers to leave THG-IN and instead do business with Future.

63.     His solicitations have been successful, resulting in THG-IN losing multiple accounts to Future.

64.     For example, in or around December 2021, Moore obtained an Agent of Record letter stating Terwillegar Farms cancelled its insurance policy written with OMIA and obtained a replacement policy written with Future.  The Terwillegar Farms account was among the assets THG-IN purchased in the OMIA acquisition.

65.     Kolaja signed the Agent of Record letter on Future's behalf and is identified as the "Agent" on the letter.

*Compare*: Signature on Agent of Record Letter;



*with*: Signature on Release Agreement.

Stephen M. Kolaja

Date: 7-31-19

66.     Moore spoke with a representative of Terwillegar Farms who confirmed that Kolaja had communicated with Terwillegar Farms about its business on Future's behalf.

67.     Similarly, during a renewal meeting, Justin Finney, another prohibited account, informed Moore that Kolaja approached him for business and that Finney had decided to move several of his accounts, including Finney Trucking and Finney Properties, LLC, from THG-IN to Future.  These accounts were among the assets THG-IN purchased in the OMIA acquisition.

68.     THG-IN has lost additional accounts it acquired from OMIA to Future, including James and Lisa Goss, Casey's Bike Shop, and Triple D Door, LLC.  Upon information and belief, Kolaja solicited these clients to obtain their business for Future.

69.     Upon information and belief, Kolaja has been falsely representing to customers that his non-competition obligations have expired and that he is free to work in the insurance business and with THG-IN's customers.

15

70.   Upon information and belief, to conceal his actions from THG-IN, Kolaja has advised customers to tell THG-IN that he did not solicit them but that they sought him out to do business, even though such statements are false.

71.   Kolaja has violated, and continues to violate, his non-competition obligations under the Operating Agreement.

72.   Kolaja's employment as Future's Vice President of Business Development violates his non-competition obligations under the Operating Agreement.

73.   Kolaja has contacted and solicited, and continues to contact and solicit, THG-IN's customers in violation of his non-competition obligations under the Operating Agreement.

74.   To date, THG-IN has lost tens of thousands of dollars in annual and recurring revenue to Future as a result of Kolaja's unlawful actions.

75.   Given the nature of the insurance brokerage industry, THG-IN's revenue losses will increase each year.

76.   Given the nature of Kolaja's unlawful actions, the value of the relief THG-IN seeks, including actual damages and a permanent injunction, exceeds $75,000.

77.     Given the nature of Kolaja's unlawful actions, the cost to Kolaja of the relief THG-IN seeks, including actual damages and a permanent injunction, exceeds $75,000.

78.     Kolaja's unfair competition is a serious and legitimate concern for THG-IN.

79.     Kolaja—both individually and through Anchored—received substantial sums of money from his relationship with OMIA.

80.     Indeed, Moore continues to make monthly payments to Kolaja (through Anchored) as required under the Release Agreement.

81.     When Kolaja executed the Release Agreement, he acknowledged his continuing obligation to abide by the Operating Agreement's non-competition clause.  He, however, has refused to abide by his contractual obligation.

82.     Kolaja's refusal to honor his contract has caused THG-IN and its employees significant and irreparable harm.

83.     THG-IN's business is particularly vulnerable to business producers who breach their contractual obligations to compete unfairly with THG-IN for its customers.

84.     When an experienced broker, like Kolaja, successfully steals an account, the full amount of the loss is difficult to measure.  This is due in part to the

loss of that customer's future referrals and because the specific value of any given customer in the insurance brokerage field is subject to a multitude of variable factors.

85.     Given this difficulty in valuing losses, there is tremendous value to protecting THG-IN's business and customer base from further unlawful competition by Kolaja, as the resulting damage cannot be undone.

86.     If Kolaja is not prevented from continuing to compete with THG-IN and soliciting its customers, THG-IN risks losing the customers it acquired from OMIA and possibly other customers.  The resulting harm will not be reversible or easy to quantify.

87.     Given Kolaja's consistent refusal to abide by his contractual obligations, THG-IN is concerned that Kolaja plans to further damage THG-IN's business interests.

<u>COUNT I</u>
**(Breach of the Operating Agreement)**

88.     THG-IN incorporates by reference Paragraphs 1 through 88 of this Verified Complaint.

89.     Section 6.3(b) of the Operating Agreement is a valid and enforceable non-competition covenant to which Kolaja is bound.

90.     Kolaja received adequate and sufficient consideration in connection with the Operating Agreement.

18

91.     The restrictions on competition contained in Section 6.3(b) of the Operating Agreement and set forth in Paragraph 28 above are valid and enforceable.

92.     Kolaja reaffirmed his obligation to comply with Section 6.3(b) of the Operating Agreement when he executed the Release Agreement.

93.     OMIA assigned to THG-IN its right to enforce Kolaja's non-competition obligation set forth in Section 6.3(b) of the Operating Agreement.

94.     The restraints on Kolaja imposed by Section 6.3(b) of the Operating Agreement are no greater than necessary to protect THG-IN's legitimate business interests.

95.     The restrictions contained in Section 6.3(b) of the Operating Agreement are not unreasonably harsh or oppressive in curtailing Kolaja's legitimate efforts to earn a livelihood.

96.     The restraints imposed on Kolaja by Section 6.3(b) of the Operating Agreement are reasonable from the standpoint of public policy and are consistent with industry standards.

97.     The temporal limitation set forth in Section 6.3(b) of the Operating Agreement is reasonable in light of Kolaja's (through Anchored) acquisition of a twenty-five percent (25%) membership interest in OMIA and the competitive nature of the insurance brokerage business.

98.    Kolaja's conduct, including working for Future within a fifty (50) mile radius of THG-IN's current (and OMIA's former) offices and contacting and soliciting THG-IN's customers, constitutes a breach of his obligations under Section 6.3(b) of the Operating Agreement.

99.    To date, THG-IN has lost tens of thousands of dollars in revenue as a result of Kolaja's breach of his obligations under Section 6.3(b) of the Operating Agreement.

100.    As a consequence of Kolaja's conduct, THG-IN has suffered and/or will continue to suffer irreparable harm or loss, and has suffered and will continue to suffer financial and economic loss.

## PRAYER FOR RELIEF

WHEREFORE, THG-IN respectfully requests the following:

A.    Injunctive relief against Kolaja, whether acting alone or in concert with others, requiring him to comply with his obligations under Section 6.3(b) of the Operating Agreement;

B.    An order equitably extending the restricted period under Section 6.3(b) of the Operating Period to account for the period during which Kolaja has been in violation thereof;

C.    An order requiring Kolaja, and anyone acting in concert with him, to preserve and not destroy or alter in any manner all documents or other information

in his possession, custody or control (including, but not limited to, notes, calendar entries, invoices, e-mails, text messages, voice messages, and phone records) that may be relevant or discoverable in this litigation, including, but not limited to, all records and any other evidence of Kolaja's communications with THG-IN's current and former customers;

D.    An accounting of all income earned or derived from any business activity with any current or former THG-IN customer or from any business activity which violates Section 6.3(b) of the Operating Agreement;

E.    An order permitting THG-IN to take expedited discovery to determine the scope and nature of Kolaja's breaches of Section 6.3(b) of the Operating Agreement;

F.    An order declaring Kolaja to be in breach of Section 6.3(b) of the Operating Agreement;

G.    Actual damages against Kolaja in excess of $75,000.00 Dollars, in an amount to be determined at trial;

H.    Interest;

I.    For a trial by jury on all issues so triable; and

J.    Any other relief the Court deems appropriate.

21

## JURY DEMAND

Plaintiff demands a jury for all issues so triable.

Dated: March 14, 2022

Respectfully submitted,

CLARK HILL PLC

/s/Carol G. Schley
Carol G. Schley (P51301)
151 South Old Woodward Ave., Ste. 200
Birmingham, MI 48009
(248) 530-6338
cschley@clarkhill.com

Rodney A. Satterwhite (admission
application to be submitted)
Igor Babichenko (admission application to
be submitted)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
(804)775 7617
rsatterwhite@mcguirewoods.com
ibabichenko@mcguirewoods.com

Attorneys for Plaintiff

09998-1369\266317658.v1

# EXHIBIT 1

# RESTATED OPERATING AGREEMENT

# OF

# OWEN MOORE INSURANCE AGENCY, LLC

# RESTATED OPERATING AGREEMENT
## OF
## OWEN MOORE INSURANCE AGENCY, LLC

### TABLE OF CONTENTS

ARTICLE I - DEFINITIONS ...........................................................................................1

    1.1    Act.............................................................................................................1
    1.2    Affiliate.....................................................................................................1
    1.3    Agreement..................................................................................................1
    1.4    Articles......................................................................................................1
    1.5    Assignment................................................................................................1
    1.6    Bankruptcy.................................................................................................1
    1.7    Capital Accounts........................................................................................1
    1.8    Code...........................................................................................................1
    1.9    Company.....................................................................................................2
    1.10   Contributing Member .................................................................................2
    1.11   Contribution...............................................................................................2
    1.12   Control .......................................................................................................2
    1.13   Deceased Member......................................................................................2
    1.14   Disassociation Date....................................................................................2
    1.15   Disassociation of Membership....................................................................2
    1.16   Dissolution of a Member ...........................................................................2
    1.17   FSC&S .......................................................................................................2
    1.18   Indemnified Person ....................................................................................2
    1.19   Majority of Members .................................................................................2
    1.20   Member......................................................................................................3
    1.21   Member Representative ..............................................................................3
    1.22   Membership Interest or Interest .................................................................3
    1.23   Noncontributing Member ...........................................................................3
    1.24   Offer...........................................................................................................3
    1.25   Offered Membership Interest......................................................................3
    1.26   Offerees......................................................................................................3
    1.27   Person.........................................................................................................3
    1.28   Resident Agent...........................................................................................3
    1.29   Registered Office .......................................................................................3
    1.30   Sharing Ratio .............................................................................................3
    1.31   Transferring Member .................................................................................3
    1.32   Withdrawal.................................................................................................3
    1.33   Withdrawing Member.................................................................................4

ARTICLE II - ORGANIZATION ...................................................................................4

    2.1    Formation...................................................................................................4
    2.2    Name..........................................................................................................4
    2.3    Purposes.....................................................................................................4

| | 2.4 | Duration | 4 |
|---|---|---|---|
| | 2.5 | Intention for Company | 4 |
| | 2.6 | Effective Date | 4 |
| | 2.7 | Conflict between Articles and Agreement | 4 |

ARTICLE III - BOOKS, RECORDS AND ACCOUNTING .................................................4

| | 3.1 | Books and Records | 4 |
|---|---|---|---|
| | 3.2 | Fiscal Year; Accounting | 4 |
| | 3.3 | Reports | 5 |
| | 3.4 | Members' Capital Accounts | 5 |
| | 3.5 | Member Tax Treatment | 5 |

ARTICLE IV - CAPITAL CONTRIBUTIONS ..............................................................5

| | 4.1 | Initial Commitments and Contributions | 5 |
|---|---|---|---|
| | 4.2 | Additional Contributions | 5 |
| | 4.3 | Failure to Contribute | 6 |
| | 4.4 | Maintenance of Capital Accounts | 6 |
| | 4.5 | Distribution of Assets | 7 |
| | 4.6 | Sale or Exchange of Interest | 7 |

ARTICLE V - ALLOCATIONS AND DISTRIBUTIONS ...............................................7

| | 5.1 | Allocations | 7 |
|---|---|---|---|
| | 5.2 | Distributions | 7 |

ARTICLE VI - DISPOSITION OF MEMBERSHIP INTERESTS ..................................8

| | 6.1 | General | 8 |
|---|---|---|---|
| | 6.2 | Registration and Transfer of Interest | 8 |
| | 6.3 | Covenant Not To Compete. | 8 |

ARTICLE VII - MEETING AND REPRESENTATIONS OF MEMBERS ......................9

| | 7.1 | Member Representative | 9 |
|---|---|---|---|
| | 7.2 | Voting | 9 |
| | 7.3 | Annual Meetings | 9 |
| | 7.4 | Notice of Meetings | 10 |
| | 7.5 | Consent | 10 |
| | 7.6 | Quorum | 10 |
| | 7.7 | Manner of Acting | 10 |
| | 7.8 | Representations and Warranties | 10 |
| | 7.9 | Investment Decision | 10 |
| | 7.10 | Proxies | 11 |
| | 7.11 | Electronic Meetings | 11 |

ARTICLE VIII - MANAGEMENT .............................................................................11

| | | |
|---|---|---|
| 8.1 | Management of Business | 11 |
| 8.2 | General Management Powers of the Members. | 11 |
| 8.3 | Standard of Care; Liability | 12 |
| 8.4 | Partner Representative | 12 |
| 8.5 | Compensation | 12 |
| 8.6 | Committees | 12 |

ARTICLE IX - OFFICERS ...... 12

| | | |
|---|---|---|
| 9.1 | Officers | 12 |
| 9.2 | Duties of Officers | 13 |

ARTICLE X - EXCULPATION OF LIABILITY; INDEMNIFICATION ...... 13

| | | |
|---|---|---|
| 10.1 | Exculpation of Liability | 13 |
| 10.2 | Mandatory Indemnification by the Company | 13 |

ARTICLE XI - DISSOLUTION AND WINDING UP ...... 14

| | | |
|---|---|---|
| 11.1 | Dissolution | 14 |
| 11.2 | Winding Up | 14 |

**ARTICLE XII - STEPHEN M. KOLAJA AND RANDAL A. MOORE** ...... 14

| | | |
|---|---|---|
| 12.1 | Purchase of a Membership Interest Upon the Death of Stephen M. Kolaja ("Kolaja") | 14 |
| 12.2 | Purchase Price | 15 |
| 12.3 | Terms of Payment of Purchase Price | 15 |
| 12.4 | Purchase of Membership Interest Upon Termination of Employment of Kolaja. | 15 |
| 12.5 | Purchase of Membership Interest Upon the Death of Randal A. Moore | 15 |
| 12.6 | Purchase Price | 15 |
| 12.7 | Terms of Payment of Purchase Price | 15 |
| 12.8 | Right of First Refusal | 157 |

ARTICLE XIII - DISASSOCIATION OF 25% MEMBER ...... 17

| | | |
|---|---|---|
| 13.1 | Purchase of Membership Interest Upon Disassociation of 25% Member | 17 |
| 13.2 | Purchase Price | 17 |
| 13.3 | Payment of Purchase Price | 17 |

ARTICLE XIV - ADDITION OF NEW MEMBERS ...... 17

| | | |
|---|---|---|
| 14.1 | Addition of New Members | 17 |
| 14.2 | Sale by Owen Moore | 17 |

ARTICLE XV -  MISCELLANEOUS PROVISIONS ................................................................18

    15.1   Nouns and Pronouns .........................................................................................18
    15.2   Headings ...........................................................................................................18
    15.3   Counterparts......................................................................................................18
    15.4   Entire Agreement..............................................................................................18
    15.5   Severability .......................................................................................................18
    15.6   Amendment........................................................................................................18
    15.7   Notices ..............................................................................................................18
    15.8   Binding Effect...................................................................................................18
    15.9   Governing Law .................................................................................................18
    15.10  Advice of Counsel ...........................................................................................18

## RESTATED OPERATING AGREEMENT
## OF
## OWEN MOORE INSURANCE AGENCY, LLC

### A Michigan Limited Liability Company

THE OPERATING AGREEMENT made and entered into as of the 1st day of December, 2015 by and among OWEN MOORE INSURANCE AGENCY, LLC, a Michigan limited liability company (the "Company"), and its sole Member OWEN MOORE AGENCY, INC., a Michigan corporation ("Owen Moore"), is hereby restated in its entirety this 1st day of January, 2016 by and between the Company, Owen Moore and ANCHORED INVESTMENTS, INC., a Michigan corporation ("Anchored") (Owen Moore and Anchored collectively the "Members") and Stephen M. Kolaja, personally ("Kolaja") as follows:

### ARTICLE I - DEFINITIONS

1.1     Act.  Act shall be defined as the Michigan Limited Liability Company Act, being Act No. 23, Public Acts of 1993, as amended.

1.2     Affiliate.  Affiliate shall mean, with respect to a person, any person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such person.

1.3     Agreement.  The Agreement shall be defined as the valid written Operating Agreement signed by the Members of the Company, which Agreement specifies the affairs and conduct of the Company, including any provision in the Articles pertaining to the affairs and conduct of the Business of the Company.

1.4     Articles.  Articles shall be defined as the Articles of Organization as filed with the State of Michigan as required by the Act.

1.5     Assignment.  Assignment shall include any type of sale or transfer of a Member's Membership Interest in the Company.

1.6     Bankruptcy.  The bankruptcy of a Member shall be defined as the filing by a Member of any petition in bankruptcy or for the reorganization, liquidation or similar relief under any federal or state statute, law or regulation governing the rights and relief of debtors; or the adjudication of a Member as bankrupt or insolvent; or the acquiescence by a Member to the appointment of a trustee, receiver or liquidator for all or any substantial part of the Member's assets, or the making by a Member of an assignment for the benefit of creditors or any substantially similar action on the part of a Member.

1.7     Capital Accounts.  Capital Account shall be as defined in paragraph 4.4 of this Agreement.

1.8     Code.  Code is defined as the Internal Revenue Code of 1986, as amended.

1

1.9     Company.  Company shall be defined as the Owen Moore Insurance Agency, LLC.

1.10    Contributing Member.  Contributing Member shall be defined as a Member choosing to make additional contributions when another Member becomes a Noncontributing Member.

1.11    Contribution.  Contribution shall mean anything of value that a person contributes to the Company as a prerequisite for, or in connection with, membership, including cash, property, services performed, or a promissory note or other binding obligation to contribute cash or property, or to perform services.

1.12    Control.  Control shall be defined as the possession, directly or indirectly, of the power to direct or cause the direction of the management, activities or policies of any person through the ownership of voting securities, by contract, employment or otherwise.

1.13    Deceased Member.  Deceased Member shall be defined as a Member who has died during the term of this Agreement.

1.14    Disassociation Date.  Disassociation Date shall be defined as the date of the event which causes the withdrawal of the Withdrawing Member.

1.15    Disassociation of Membership.  Disassociation of Membership shall be defined as the withdrawal of a Member from the Company only upon the bankruptcy or dissolution of a Member.

1.16    Dissolution of a Member.  Dissolution of a Member shall be deemed to occur when:

        a.      formal action is taken by a Member to dissolve its legal status under the laws of the state permitting such Member's organization; or

        b.      formal action to dissolve such Member is taken by the state permitting such Member's organization; and

        c.      written notice of such dissolution is delivered to the Company and to the remaining Members within thirty (30) days of the date the formal action is taken.

1.17    FSC&S.  FSC&S shall be defined as Foster, Swift, Collins & Smith, P.C., a Michigan professional corporation.

1.18    Indemnified Person.  An Indemnified Person shall be any individual indemnified pursuant to the provisions of paragraph 10.2 of this Agreement.

1.19    Majority of Members or Majority Vote.  For purposes of this Agreement, any reference to a majority of Members, or majority of remaining Members, or majority vote of the Members shall be defined as those Members holding greater than fifty percent (50%) of the Sharing Ratios of the Members or remaining Members, if applicable.

2

1.20   Member. Member shall mean a person who has been admitted to the Company as provided in the Act, and who has the rights and obligations specified under the Act.

1.21   Member Representative. A Member Representative shall be defined as an individual designated by a Member who is authorized to act on behalf of said Member.

1.22   Membership Interest or Interest. Membership Interest or Interest shall be defined as a Member's rights in the Company, including, but not limited to, the right of a Member to receive distributions of the Company's assets and any right of a Member to vote or participate in the Management of the Company.

1.23   Noncontributing Member. Noncontributing Member shall be defined as any Member who does not make additional capital contributions according to the Member's Sharing Ratio as provided in paragraph 4.2 of this Agreement.

1.24   Offer. Offer shall be defined as a written offer made by a prospective buyer, assignee, or transferee of a Transferring Member's Membership Interest in the Company.

1.25   Offered Membership Interest. An Offered Membership Interest shall be defined as that portion of a Membership Interest being sold, assigned, or transferred by a Transferring Member.

1.26   Offerees. Offerees shall be defined as the Members of the Company excluding the Transferring Member.

1.27   Person. Person shall mean an individual, partnership, limited liability company, trust, custodian, estate, association, corporation, governmental entity, or any other legal entity.

1.28   Resident Agent. The Resident Agent of the Company shall be as designated in the Articles or any amendment to the Articles. The Resident Agent may be changed from time to time and such change shall be made in accordance with the Act. If the Resident Agent shall ever resign, the Company shall promptly appoint a successor.

1.29   Registered Office. The Registered Office of the Company shall be as designated in the Articles or any amendment to the Articles. The Registered Office may be changed from time to time and such change shall be made in accordance with the Act.

1.30   Sharing Ratio. Sharing Ratio shall be defined as the percentage interest owned by the Member in the total capital of the Company, as adjusted from time to time to reflect changes in the Capital Account of a Member and the total capital of the Company.

1.31   Transferring Member. A Transferring Member shall be defined as a Member who sells, assigns, transfers, or exchanges some or all of said Member's Membership Interest in the Company.

1.32   Withdrawal. Withdrawal shall be defined as a Member withdrawing, attempting to withdraw, or voluntarily dissolving.

1.33    Withdrawing Member.  Withdrawing Member shall be defined as the withdrawal of a Member from the Company upon the Member's Disassociation of Membership.

## ARTICLE II - ORGANIZATION

2.1    Formation.  The Company has been organized as a Michigan Limited Liability Company under and pursuant to the Act, by the filing of Articles with the State of Michigan.

2.2    Name.  The name of the Company shall be Owen Moore Insurance Agency, LLC. The Company may also conduct its business under one or more assumed names.

2.3    Purposes.  The purposes of the Company are to engage in any activity for which Limited Liability Companies may be formed under the Act.  The Company shall have all the powers necessary or convenient to effect any purpose for which it is formed, including all powers granted by the Act.

2.4    Duration.  The duration of the Company shall be perpetual and shall continue until the Company is dissolved and its affairs wound up in accordance with the Act or this Agreement.

2.5    Intention for Company.  The Members have formed the Company as a Limited Liability Company under and pursuant to the Act.  The Members specifically intend and agree that the Company not be a partnership (including, a limited partnership) or any other venture, but a Limited Liability Company under and pursuant to the Act.  No Member shall be construed to be a partner in the Company or a partner of any other Member, or person and the Articles, this Agreement and the relationships created thereby and arising therefrom shall not be construed to suggest otherwise.  Notwithstanding the foregoing, however, the Members intend that the Company be treated as a partnership for federal income tax purposes.

2.6    Effective Date.  The Agreement shall become effective upon the date this Agreement is fully executed, or the date the Articles are filed with the State of Michigan, whichever is later.

2.7    Conflict between Articles and Agreement.  If there is a conflict between the Company's Articles and the Agreement, the Articles shall control.

## ARTICLE III - BOOKS, RECORDS AND ACCOUNTING

3.1    Books and Records.  The Company shall maintain complete and accurate books and records of the Company's business and affairs as required by the Act.  Such books and records shall be kept at the Company's Registered Office or principal place of business.  The books and records shall be open to inspection by any Member or a Member's authorized representative at any reasonable time during business hours.

3.2    Fiscal Year; Accounting.  The Company's fiscal year shall be the calendar year. The particular accounting methods and principles to be followed by the Company shall be selected by the Members from time to time.

4

3.3    Reports.  The Members shall provide reports concerning the financial condition and results of operation of the Company and the Capital Accounts of the Members to the Members in the time, manner and form as the Members determine.  Such reports shall be provided at least quarterly as soon as practicable after the end of each fiscal quarter and shall include a statement of each Member's share of profits and other items of income, gain, loss, deduction and credit.

3.4    Members' Capital Accounts.  A separate Capital Account for each Member shall be maintained by the Company.  Each Member's Capital Account shall reflect the Member's capital contributions and increases for the Member's share of any net income or gain of the Company.  Each Member's Capital Account shall also reflect decreases for distributions made to the Member and the Member's share of any losses and deductions of the Company.

3.5    Member Tax Treatment.  No Member shall treat a Company tax item on such Member's federal, state or local income or other tax returns or permit an affiliate to treat a Company tax item on such affiliate's tax returns in a manner inconsistent with the treatment of such item on the Company's federal, state or local tax returns.

## ARTICLE IV - CAPITAL CONTRIBUTIONS

4.1    Initial Commitments and Contributions.  By the execution of this Agreement, the initial Members hereby agree to make the capital contributions as set forth in the attached Exhibit A.  The Sharing Ratios of the respective Members in the total capital of the Company are also set forth in Exhibit A.  Any additional Member (other than an assignee of a Membership Interest who has been admitted as a Member) shall make the capital contribution set forth in a separate written Admission Agreement at the time of admission.  No interest shall accrue on any capital contribution and no Member shall have any right to withdraw or to be repaid any capital contribution except as provided in this Agreement.

4.2    Additional Contributions.  In addition to the initial capital contributions, a majority vote of the Members may determine from time to time that additional capital contributions are needed to enable the Company to conduct its business and affairs.

a.    Notice.  Upon making such a determination that additional capital contributions are needed, notice shall be given to all Members in writing at least thirty (30) business days prior to the date on which such additional contributions are due.  Such notice shall describe, in reasonable detail, the purposes and uses of such additional capital, the amounts of additional capital required, and the date by which payment of the additional capital is required.

b.    Member Option.  Except to the extent of a Member's unpaid commitment to contribute additional capital, a Member shall have the right, but not the obligation, to make additional capital contributions according to said Member's Sharing Ratio.

c.    If Member Does Not Make Additional Contribution.  In the event a Member is a Noncontributing Member, the Contributing Member(s) shall be given the opportunity to make such Noncontributing Member's contribution in the proportion that each such Contributing Member's Sharing Ratio bears to all other Contributing Members' Sharing Ratios.

d. <u>Adjustment to Sharing Ratios of Members</u>. After the additional capital contributions have been made, the Sharing Ratio of each Member shall be adjusted to reflect the total capital contributed to the Company and the Capital Accounts of each Member.

4.3 <u>Failure to Contribute</u>. If any Member fails to make a capital contribution when required in accordance with the Member's commitment to contribute initial or additional capital, the Company may, in addition to the other rights and remedies the Company may have under the Act or applicable law, take such enforcement action (including, the commencement and prosecution of court proceedings) against such Member as the Members consider appropriate. Moreover, the remaining Members may elect to contribute the amount of such required capital themselves, according to their respective Sharing Ratios. After all capital contributions have been made, the Sharing Ratio of each Member shall be adjusted to reflect the total capital contributed to the Company and the Capital Accounts of each Member.

4.4 <u>Maintenance of Capital Accounts</u>. The Company shall establish and maintain a Capital Account for each Member and assignee.

a. <u>Increases to Capital Accounts</u>. Each Member's Capital Account shall be increased by:

i. the amount of any money actually contributed by the Member to the capital of the Company;

ii. the fair market value of any property contributed, as determined by the Company and the contributing Member at arm's length at the time of contribution (net of liabilities assumed by the Company or subject to which the Company takes such property, within the meaning of Code §752); and

iii. the Member's share of net profits and of any separately allocated items of income or gain including adjustments required by Code §1.704.1(b)(2)(iv)(b) (e.g. any gain and income from unrealized income with respect to accounts receivable allocated to the Member to reflect the difference between the book value and tax basis of assets contributed by the Member).

b. <u>Decreases to Capital Accounts</u>. Each Member's Capital Account shall be decreased by:

i. the amount of any money actually distributed by the Company to the Member;

ii. the fair market value of any property distributed to the Member, as determined by the Company and the receiving Member at arm's length at the time of distribution (net of liabilities of the Company assumed by the Member or subject to which the Member takes such property within the meaning of Code §752); and

iii. the Member's share of net losses and of any separately allocated items of deduction or loss including adjustments required by Code §1.704.1(b)(2)(iv)(b) (e.g. any

6

loss or deduction allocated to the Member to reflect the difference between the book value and tax basis of assets contributed by the Member).

4.5     Distribution of Assets. If the Company at any time distributes any of its assets in-kind to any Member, the Capital Account of each Member shall be adjusted to account for that Member's allocable share of the net profits or net losses that would have been realized by the Company had it sold the assets that were distributed at their respective fair market values immediately prior to their distribution.

4.6     Sale or Exchange of Interest. In the event of a sale or exchange of some or all of a Member's Membership Interest in the Company by a Transferring Member, the Capital Account of the Transferring Member shall become the Capital Account of the assignee, to the extent it relates to the portion of the Membership Interest so transferred.

## ARTICLE V - ALLOCATIONS AND DISTRIBUTIONS

5.1     Allocations.   Except as may be required by the Code or this Agreement, net profits, net losses, and other items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Sharing Ratios.

5.2     Distributions.

a.     Determination. The Members may, by majority vote, determine to make distributions to the Members from time to time only after the Members determine, in their reasonable judgment, that the Company has sufficient cash and/or property on hand which exceeds the current and the anticipated needs of the Company to fulfill its business purposes (including needs for operating expenses, debt service, acquisitions, reserves and mandatory distributions, if any).

b.     Distributions to Members. All distributions shall be made to the Members in accordance with their Sharing Ratios.

c.     Types of Distributions. Distributions shall be in cash and/or property as determined by the Members.

d.     Distribution Not Allowed. No distribution shall be declared or made if, after giving it effect:

i.     the Company would not be able to pay its debts as they become due in the usual course of business;

ii.     the Company's total assets would be less than the sum of its total liabilities; or

iii.     the Company would not have the amount needed if it were to dissolve at the time of the distribution to satisfy the preferential rights of other Members upon dissolution that are superior to the rights of the Members receiving the distribution.

7

     e.     <u>Liability of Members in Approving a Distribution</u>. A Member who votes for or assents to a distribution in violation of the Act or the Agreement, shall be personally liable, jointly and severally, to the Company for the amount of the distribution that exceeds the amount that could have been distributed without violating the Act or the Agreement.

     f.     <u>Liability of Member in Accepting a Distribution</u>. A Member who accepts or receives a distribution with knowledge of facts indicating the distribution is in violation of the Act or the Agreement is liable to the Company for the amount the Member accepts or receives that exceeds the Member's share of the amount that could have been distributed without violating the Act or the Agreement.

     g.     <u>Limit of Liability</u>. Each Member held liable under paragraph 5.2(e) or 5.2(f) for an unlawful distribution is entitled to a contribution from each other Member who could also be held liable under paragraphs 5.2(e) or 5.2(f). The contribution of a Member held liable under both paragraphs 5.2(e) and 5.2(f) shall not exceed the said Member's liability under either paragraphs 5.2(e) or 5.2(f), whichever is greater.

## ARTICLE VI - DISPOSITION OF MEMBERSHIP INTERESTS

6.1     <u>General</u>. Every sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation or other disposition of any Membership Interest shall be made only upon compliance with this Article. No Membership Interest shall be disposed of if:

     a.     the disposition would cause a termination of the Company as defined under the Code;

     b.     the disposition would be in violation of any applicable state or federal securities law or regulation; or

     c.     the assignee of the Membership Interest does not provide the Company with the information and agreements that the Members may require in connection with such disposition. Any attempted disposition of a Membership Interest in violation of this Article is null and void.

6.2     <u>Registration and Transfer of Interest</u>. Each Member hereby acknowledges and represents that notwithstanding any provisions contained in this Agreement, no Company interest or Membership Interest may be offered or sold and no transfer of such interest will be made either by the Company or the Members unless such interest is registered under the Securities Act of 1933 and any applicable securities laws of the State of Michigan or an opinion of counsel for the Company, is obtained to the effect that there is no violation of applicable federal or state laws and the cost of such is reimbursed to the Company by the Member transferring the Membership Interest.

6.3     <u>Covenant Not To Compete</u>.

     a.     While Stephen M. Kolaja ("Kolaja") is employed by the Company or Owen Moore, Kolaja agrees that he will not, directly or indirectly, either alone or in association with others, for themselves or for any other person, company, firm or corporation, either as

8

principal, agent, employee, member, manager, director, officer, member, stockholder, or in any other capacity, conduct, become engaged in, or interested in, any business the same or similar to the Company's business or Owen Moore's business.

      **b.**     If Anchored sells, assigns or transfers its membership interest in the Company to the Company, another Member, or to a third party, Kolaja agrees that he will not, for a period of five (5) years from the date of sale, directly or indirectly, either alone or in association with others, for themselves or for any other person, firm, or company, either as principal, agent, employee, manager, director, officer, member, stockholder, or in any other capacity, contact current customers of the Company or of Owen Moore, conduct, become engaged in, or interested in, any business the same or similar to the Company's business or Owen Moore's business, within a radius of fifty (50) miles from any Company or Owen Moore location.

## ARTICLE VII - MEETING AND REPRESENTATIONS OF MEMBERS

      7.1    <u>Member Representative</u>. Each Member who is not an individual may designate a Member Representative for purposes of meetings of members and all decisions, actions and communications on behalf of such Member. A Member may designate a new Member Representative by written notice to the Company and the other Members executed by either the existing Member Representative of such member or by the chairperson or President of such Member. Each Member Representative, when appointed and designated, and until terminated, shall be deemed to have full and complete authority to act on behalf of the Member the Member Representative represents, and to bind such Member in all matters relating to, arising out of, or in connection with this Agreement, and the management and operation of the Company. No Member Representative shall be personally liable to the Members by reason of said Member Representative's acts as such, except in the case of said Member Representative's gross negligence or actual fraudulent or dishonest conduct, or liable to any third party for the debts and obligations of the Company. If applicable, the Member Representative for each Member shall be set forth in Exhibit A.

      7.2    <u>Voting</u>. All Members shall be entitled to vote on any matter required by law to have a membership vote or those matters submitted to the Members. Unless a greater vote is required by the Act, the Articles, or other provisions of this Agreement, the affirmative vote or consent of those Members entitled to vote or consent on such matters holding greater than fifty percent (50%) of the Sharing Ratios shall be required.

      7.3    <u>Annual Meetings</u>. An annual meeting of Members for the transaction of such business as may properly come before the Meeting, may be held at such place, on such date, and at such time as the Members shall determine. Special meetings of Members for any proper purpose or purposes may be called at any time by the Members or the holders of at least ten percent (10%) of the Sharing Ratios of all Members. The Company shall deliver or mail written notice stating the date, time, place and purposes of any meeting to each Member entitled to vote at the meeting. Such notice shall be given not less than ten (10), nor more than sixty (60) days before the date of the meeting. All meetings of the Members shall be presided over by a Chairperson who shall be a Member so designated by the Members. Presence at a meeting

waives the required notice of the meeting unless the Member at the beginning of the meeting objects to holding the meeting or the transacted business at the meeting.

7.4    Notice of Meetings.   The Company shall deliver or mail written notice stating the date, time, place and purposes of any meeting to each Member entitled to vote at the meeting. Such notice shall be given not less than ten (10), nor more than sixty (60) days before the date of the meeting.  All meetings of the Members shall be presided over by a Chairperson who shall be a Member so designated by the Members.  Presence at a meeting waives the required notice of the meeting unless the Member at the beginning of the meeting objects to holding the meeting or the transacted business at the meeting.

7.5    Consent. Any action required or permitted to be taken at an annual or special meeting of the Members may be taken without a meeting, without prior notice, and without a vote, if consents in writing, setting forth the action so taken are signed by a unanimous consent of the Members.  Every written consent shall bear the date and signature of each Member who signs the consent.

7.6    Quorum.  A majority of the Sharing Ratios of the Members shall constitute a quorum for the transaction of business at any meeting of the Members provided that if less than such number of Members are present at said meeting, a majority of the Sharing Ratios of the Members present may adjourn the meeting at any time without further notice.

7.7    Manner of Acting.  At a meeting of the Members at which a quorum is present, the act of a majority of the Sharing Ratios of the Members or their duly appointed designees, present and entitled to vote on the matter shall be the official act of the Members, unless the act of a greater number is required by the Act, this Agreement or the Articles.

7.8    Representations and Warranties.   Each member, and in the case of an organization, the person(s) executing the Agreement on behalf of the organization, hereby represents and warrants to the Company and each other Member that if the Member is an organization, it is duly organized, validly existing, and in good standing under the laws of its state of organization and that it has full organizational power to execute and agree to the Agreement to perform its obligations hereunder.

7.9    Investment Decision. Each Member hereby further acknowledges and represents that:

a.    the Member is acquiring said Member's Membership Interest in the Company for the Member's own account as an investment and without an intent to distribute the interest;

b.    the interest in the Company has not been registered under the Securities Act of 1933 or any state securities laws in reliance upon applicable exemptions under said laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements;

c.    the Member has such knowledge and experience in financial and business matters that the Member is capable of evaluating the merits and risks of investing in the

Membership Interest and can bear the economic risk of an investment in the Membership Interest for an indefinite period of time;

        d.     the Member has made an independent investment analysis in deciding to become a Member;

        e.     the Member has had the opportunity: (i) to investigate the business of the Company, the qualifications of the other Members, and the tax and financial implications of an investment in the Company, (ii) to ask questions of, and receive answers from the Company concerning the business and financial condition of the Company and the terms and conditions of ownership of the Membership Interest, and (iii) to obtain such supplemental information as the Member deemed desirable.  The Member represents and warrants that all such information has been made readily available to the Member by the Company;

        f.     the Member has deemed the investment appropriate for said Member; and

        g.     the Member understands that an investment in the Membership Interest involves certain variables and risks which could adversely affect the value of the Membership Interest.

        7.10   <u>Proxies</u>.  The Members of record may vote at any meeting, either in person or by proxy in writing, which proxy shall be filed with the Company before said meeting.  Such proxy shall entitle the holder of the proxy to vote at any adjournment of such meeting, but shall not be valid after the final adjournment of such meeting.  A proxy shall expire and become invalid three (3) years from the date of its execution, unless the Member executing the proxy has specified the length of time the proxy is to continue in force, which length of time shall be for a specific limited period.

        7.11   <u>Electronic Meetings</u>.  The Members may participate in a meeting of the Members by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other.  Participation in a meeting pursuant to this paragraph shall constitute presence in person at the meeting.

## ARTICLE VIII - MANAGEMENT

        8.1   <u>Management of Business</u>.  The Company shall be managed by the Members.

        8.2   <u>General Management Powers of the Members.</u>

        a.   <u>Power of Each Member</u>.  Except as may be delegated to the officers of the Company or otherwise be provided in this Agreement, the business and affairs of the Company shall be managed by the Members.  It takes a majority vote of the Members to take any action except that Owen Moore Agency, Inc., a Michigan corporation ("75% Member") may unilaterally do all things necessary or convenience to carry out the business and affairs of the Company, including the power to:

        i.     open one or more depository accounts and make deposits into and checks and withdrawals against such accounts;

ii.     enter into and execute any and all agreements, contracts, documents and instruments made on behalf of the Company during the normal course of business;

iii.     engage employees and agents, define their respective duties, and establish their compensation or remuneration;

iv.     obtain insurance covering the business and affairs of the Company and its property and on the lives and well-being of its Members, employees and agents; and

v.     commence, prosecute or defend any proceeding in the Company's name.

8.3     Standard of Care; Liability.  Every Member shall discharge said Member's duties as in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the best interests of the Company.  A Member shall not be liable for any monetary damages to the Company for any breach of such duties except for receipt of a financial benefit to which the Member is not entitled; voting for or assenting to a distribution to Members in violation of this Agreement or the Act, or a knowing violation of the law.

8.4     Partner Representative.  The Members shall designate a Member as Partner Representative who shall have the sole authority to act on behalf of the Company in connection with any IRS audit of the Company.  The Company and its Members shall all be bound by all actions taken by the Partner Representative in any IRS audit.  Until changed by the Company, the Partner Representative is Owen Moore Agency, Inc.

8.5     Compensation.  Unless the Members unanimously determine otherwise, the Members shall not be compensated for their services to the Company.  The Members, acting on behalf of the Company, may be reimbursed for reasonable expenses incurred while conducting the business of the Company.

8.6     Committees.  The Members may establish committees from time to time as deemed necessary or appropriate.  Each committee shall review relevant information and recommend action to the Members.  The Members may delegate authority to such committee as determined by the Members.

## ARTICLE IX - OFFICERS

9.1     Officers.  The Members of the Company may, in their sole discretion, elect officers of the Company to conduct the day to day affairs of the Company under the direction and supervision of the Members.  The officers elected by the Members may consist of a President, a Secretary, a Treasurer, and if desired, a Chairman of the Board and one or more Vice Presidents, who shall be elected by the Members.  The may also appoint such other officers and agents as they shall deem necessary for the transaction of business of the Company.  An officer shall hold office for the term for which said officer is elected or appointed and until said officer's successor is elected or appointed and qualified, or until said officer's resignation or removal. Two or more offices may be held by the same person, but an officer shall not execute,

acknowledge or verify an instrument in more than one capacity, if the instrument is required by law or this Agreement to be executed and acknowledged or verified by two or more officers.

9.2 <u>Duties of Officers</u>. The officers of the Company shall be charged with the daily operations of the Company and shall perform such duties as specified by the Members of the Company.

## ARTICLE X - EXCULPATION OF LIABILITY; INDEMNIFICATION

10.1 <u>Exculpation of Liability</u>. Unless otherwise provided by law or expressly assumed, a person who is a Member, Officer, or either of the two, shall not be liable for the acts, omissions, representations, covenants, debts or liabilities of the Company.

10.2 <u>Mandatory Indemnification by the Company</u>. Except as otherwise provided in this Article, the Company shall indemnify any Member and any officer of the Company, and may (in its sole discretion) indemnify any employee or agent of the Company who was or is a party or is threatened to be made a party to a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, and whether formal or informal, other than an action by or in the right of the Company, by reason of the fact that such person is or was a Member, employee, or agent of the Company.

a. <u>Indemnification Applied Against Expenses</u>. Any Indemnified Person shall be indemnified against expenses, including attorney's fees, judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such Indemnified Person in connection with the action, suit or proceeding, only if the Indemnified Person acted in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that such Indemnified Person reasonably believed to be in the best interests of the Company and, with respect to a criminal action or proceeding, if such Indemnified Person had no reasonable cause to believe such Indemnified Person's conduct was unlawful.

b. <u>Success of Person</u>. To the extent that an Indemnified Person has been successful on the merits or otherwise in defense of an action, suit or proceeding or in defense of any claim, issue or other matter in the action, suit or proceeding, such Indemnified Person shall be indemnified against actual and reasonable expenses, including attorney's fees, incurred by such Indemnified Person in connection with the action, suit or proceeding brought to enforce the mandatory indemnification provided in this Agreement.

c. <u>Events of Indemnification</u>. Any indemnification permitted under this Article, unless ordered by a court, shall be made by the Company only as authorized in the specific case and upon:

i. a determination that the indemnification is proper under the circumstances because the Indemnified Person has met the applicable standard of conduct; and

ii. an evaluation of the reasonableness of expenses and amounts paid in settlement.

13

This determination and evaluation shall be made by a majority vote of the Members who are not parties or threatened to be parties to the action, suit or proceeding.

        d.    <u>Events When Indemnification Shall Not Be Provided</u>.  Notwithstanding the foregoing to the contrary, no indemnification shall be provided to any Member, employee, or agent of the Company for or in connection with:

        i.    the receipt of a financial benefit to which such person is not entitled;

        ii.    voting for or assenting to a distribution to Members in violation of this Agreement or the Act; and

        iii.    a knowing violation of law.

## ARTICLE XI - DISSOLUTION AND WINDING UP

    11.1    <u>Dissolution</u>.  The Company shall dissolve and its affairs shall be wound up on the first to occur of the following events:

        a.    at any time specified in the Articles or this Agreement; including a vote of the Members;

        b.    upon the happening of any event specified in the Articles or this Agreement;

        c.    by the majority vote of the Members; or

        d.    upon the entry of a decree of judicial dissolution.

    11.2    <u>Winding Up</u>.  Upon dissolution, the Company shall cease carrying on its business and affairs and shall commence winding up the Company's business and affairs as soon as practicable.  Upon the winding up of the Company, the assets of the Company shall be distributed first to creditors to the extent permitted by law, in satisfaction of Company debts, liabilities, and obligations and then to Members and former Members in satisfaction of Company liabilities to them and in accordance with their Sharing Ratios.  Such proceeds shall be paid to such Members within thirty (30) days after all other debts, liabilities, and obligations have been paid.

## ARTICLE XII - STEPHEN M. KOLAJA AND RANDAL A. MOORE

    12.1    <u>Purchase of a Membership Interest Upon the Death of Stephen M. Kolaja</u> ("<u>Kolaja</u>").  Upon the death of Kolaja, Anchored, shall sell to the Company its Membership Interest in the Company, and the Company shall purchase said Membership Interest, which shall include its share in the profits and losses in the Company and all of its rights to receive distributions of Company funds, including the right to assign said Membership Interest pursuant to the terms and conditions of this Agreement.  Such sale shall occur within one hundred twenty (120) days from the date of death of Kolaja.

14

12.2   Purchase Price.  The purchase price for Anchored's Membership Interest in the Company shall be equal to the amount which Anchored would have received if Company had been sold for its fair market value on the date at the end of the month preceding the date of death of Kolaja and the Company had been liquidated (i.e. 25% of the fair market value of the Company), less what is owed by Anchored for the purchase of the Anchored Membership Interest, if any.  For purposes of this Agreement, the fair market value of the Company shall be determined by agreement of all of the Members by a Certificate of Value setting forth the fair market value of the Company, or if the date of death is more than eighteen (18) months past the date of the Certificate of Value, then by independent appraisal by an agreed upon appraiser, or if no agreement, then the Company shall pick an appraiser, Anchored shall pick an appraiser, and the two appraisers shall pick a third appraiser with the average of the two closest appraisals establishing the fair market value of the Company.  The determination of such appraiser(s) shall be binding on all parties, and the cost of the appraisal shall be borne equally by Anchored and the Company.

12.3   Terms of Payment of Purchase Price. If the purchase price for Anchored's Membership Interest in the Company is set pursuant to paragraph 12.2, but the terms of payment were not agreed upon, then the purchase price shall be paid as follows:

a.   Notice.  Within sixty (60) days of receiving notice from the Company that Kolaja has died, Anchored (hereinafter called the "Seller") shall deposit the Membership Interest to be transferred with the Company, and the Company shall issue to the Seller a promissory note pursuant to paragraph 12.3 b. below.

b.   Payment Of Purchase Price.   Simultaneously with the deposit of the Membership Interest by the Seller with the Company, the Company shall pay to the Seller ten percent (10%) of the total purchase price (the down payment), and shall deposit with the Seller a promissory note ("Promissory Note") in the amount of the unpaid balance of the Membership Interest purchase price, plus interest at the prime rate as reported in The Wall Street Journal on the date of death plus one percent (1%).  If The Wall Street Journal is not published on the date in question, the prime rate shall be the prime rate as reported in The Wall Street Journal on the next day it is published.  If more than one prime rate is reported in The Wall Street Journal, the higher of the reported rates shall be used.  If The Wall Street Journal is no longer published or if The Wall Street Journal no longer publishes a prime rate on the date in question, then the prime rate established by Comerica Bank of Lansing, Michigan shall be used to determine the prime rate.  The Promissory Note shall be executed by the Company and delivered to the Seller, and shall provide that the face amount of the Promissory Note evidencing the unpaid balance of the Membership Interest purchase price, plus any accrued interest, shall be payable in one hundred twenty (120) equal monthly installments, with the first installment to begin one (1) month from the date of the down payment referred to above.  When the note is paid, the Seller shall cancel the note so paid and return it to the Company.

12.4   Purchase of Membership Interest Upon Termination of Employment of Kolaja. If Kolaja's employment with the Company is terminated by the Company with cause or by Kolaja within 5 years of January 1, 2016, then Anchored must sell its membership interest in the Company to the Company, and the Company must purchase the membership interest for the amount equal to 25% of what Anchored has currently paid for its membership interest in the

Company. The payment for Anchored's membership interest shall be paid in sixty (60) equal monthly consecutive installments at zero percent (0%) interest, with the first payment due on the 1st day of the month after Kolaja's employment is terminated. If Kolaja's employment is terminated by the Company without cause, or by Kolaja on or after January 1, 2021 then Anchored must sell its membership interest in the Company to the Company and the Company must purchase the membership interest for the price and the terms set forth in the previous Section as if Kolaja had died.

12.5 Purchase of a Membership Interest Upon the Death of Randal A. Moore ("Moore"). Upon the death of Moore, Owen Moore, shall sell to the Company its Membership Interest in the Company, and the Company shall purchase said Membership Interest, which shall include its share in the profits and losses in the Company and all of its rights to receive distributions of Company funds, including the right to assign said Membership Interest pursuant to the terms and conditions of this Agreement. Such sale shall occur within one hundred twenty (120) days from the date of death of Moore.

12.6 Purchase Price. The purchase price for Owen Moore's Membership Interest in the Company shall be equal to the amount which Owen Moore would have received if Company had been sold for its fair market value on the date at the end of the month preceding the date of death of Moore and the Company had been liquidated (i.e. 75% of the fair market value of the Company). For purposes of this Agreement, the fair market value of the Company shall be determined by agreement of all of the Members by a Certificate of Value setting forth the fair market value of the Company, or if the date of death is more than eighteen (18) months past the date of the Certificate of Value, then by independent appraisal by an agreed upon appraiser, or if no agreement, then the Company shall pick an appraiser, Owen Moore shall pick an appraiser, and the two appraisers shall pick a third appraiser with the average of the two closest appraisals establishing the fair market value of the Company. The determination of such appraiser(s) shall be binding on all parties, and the cost of the appraisal shall be borne equally by Owen Moore and the Company.

12.7 Terms of Payment of Purchase Price. If the purchase price for Owen Moore's Membership Interest in the Company is set pursuant to paragraph 12.6, but the terms of payment were not agreed upon, then the purchase price shall be paid as follows:

a. Notice. Within sixty (60) days of receiving notice from the Company that Moore has died, Owen Moore (hereinafter called the "Seller") shall deposit the Membership Interest to be transferred with the Company, and the Company shall issue to the Seller a promissory note pursuant to paragraph 12.7 b. below.

b. Payment Of Purchase Price. Simultaneously with the deposit of the Membership Interest by the Seller with the Company, the Company shall pay to the Seller ten percent (10%) of the total purchase price (the down payment), and shall deposit with the Seller a promissory note ("Promissory Note") in the amount of the unpaid balance of the Membership Interest purchase price, plus interest at the prime rate as reported in The Wall Street Journal on the date of death plus one percent (1%). If The Wall Street Journal is not published on the date in question, the prime rate shall be the prime rate as reported in The Wall Street Journal on the next day it is published. If more than one prime rate is reported in The Wall Street Journal, the higher

16

of the reported rates shall be used. If The Wall Street Journal is no longer published or if The Wall Street Journal no longer publishes a prime rate on the date in question, then the prime rate established by Comerica Bank of Lansing, Michigan shall be used to determine the prime rate. The Promissory Note shall be executed by the Company and delivered to the Seller, and shall provide that the face amount of the Promissory Note evidencing the unpaid balance of the Membership Interest purchase price, plus any accrued interest, shall be payable in one hundred twenty (120) equal monthly installments, with the first installment to begin one (1) month from the date of the down payment referred to above. When the note is paid, the Seller shall cancel the note so paid and return it to the Company.

12.8 <u>Right of First Refusal</u>. Owen Moore, a Michigan corporation, may not sell, assign, transfer, or exchange any of its Offered Membership Interest unless Owen Moore first notifies Anchored of the identity of the prospective buyer, assignee, or transferee and sends to Anchored a copy of the Offer.

Except for a sale to children of Randal A. Moore which is permitted under Section 14.2, Owen Moore must first offer to sell the Offered Membership Interest in the Company to Anchored, for the same price and on the same terms as those being offered to Owen Moore. Anchored shall have thirty (30) days after receiving said offer to accept said offer and to purchase the Offered Membership Interest for the exact price and upon the exact terms disclosed in the Offer.

## ARTICLE XIII - DISASSOCIATION OF 25% MEMBER

13.1 <u>Purchase of Membership Interest Upon Disassociation of 25% Member</u>. If there is a Disassociation of Anchored, Anchored shall offer to sell to the Company Anchored's Membership Interest in the Company and the Company shall have an option to purchase Anchored's Membership Interest. The Company shall have an option for sixty (60) days after the Disassociation Date, or the date upon which a purchase price is determined under paragraph 13.2, whichever is longer, to purchase Anchored's interest in the Company.

13.2 <u>Purchase Price</u>. The purchase price for Anchored's membership interest shall be equal to 25% of the amount that Anchored has currently paid for its membership interest in the Company.

13.3 <u>Payment of Purchase Price</u>. The purchase price for Anchored's Membership Interest in the Company shall be paid to Anchored in sixty (60) equal consecutive monthly installments commencing on the date of closing at zero percent (0%) interest.

## ARTICLE XIV - ADDITION OF NEW MEMBERS

14.1 <u>Addition of New Members</u>. Upon the majority vote of the Members, the Members of the Company may determine that it is in the best interest of the Company to admit additional Members subject to the terms of this Agreement, as amended to reflect the new ownership interests.

17

14.2   <u>Sale by Owen Moore</u>.   Owen Moore may sell all or some of its Membership Interest in the Company to the children of Randal A. Moore, without first offering to sell such Membership Interest to Anchored under Section 12.8.

## <u>ARTICLE XV - MISCELLANEOUS PROVISIONS</u>

15.1   <u>Nouns and Pronouns</u>.   Nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the person or persons, firm or corporation may in the context require.

15.2   <u>Headings</u>.   The headings contained in this Agreement have been inserted only as a matter of convenience and for reference, and in no way shall be construed to define, limit or describe the scope or intent of any provision of this Agreement.

15.3   <u>Counterparts</u>.   This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same.

15.4   <u>Entire Agreement</u>.   This Agreement and the Articles for the Company constitute the entire agreement among the parties hereto and contain all of the agreements among said parties with respect to the subject matter hereof.   This Agreement supersedes any and all other agreements, either oral or written, between said parties with respect to the subject matter hereof.

15.5   <u>Severability</u>.   The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

15.6   <u>Amendment</u>.   In conjunction with the provisions of paragraph 7.2 of this Agreement, this Agreement may be amended or revoked at any time by a written agreement executed by all of the parties to this Agreement.   No change or modification to this Agreement shall be valid unless in writing and signed by all of the parties to this Agreement.

15.7   <u>Notices</u>.   Any notice permitted or required under this Agreement shall be conveyed to the party at the address reflected in this Agreement and will be deemed to have been given, when deposited in the United States mail, postage paid, or when delivered in person, or by courier or by facsimile transmission.

15.8   <u>Binding Effect</u>.   Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and shall inure to the benefit of the parties, and their respective distributees, heirs, successors and assigns.

15.9   <u>Governing Law</u>.   This Agreement is being executed and delivered in the State of Michigan and shall be governed by, construed and enforced in accordance with the laws of the State of Michigan, without giving effect to conflict of law principles.

15.10   <u>Advice of Counsel</u>.   The Members agree, stipulate, and acknowledge that FSC&S has prepared this Agreement on behalf of and in the course of its representation of the Company and Owen Moore as directed and that FSC&S has not represented the interest of any other Member in connection with this Agreement, and that:

18

a.      each Member has been advised that a conflict of interest may exist between said Member's interest and those of the Company and/or the other Members;

b.      each Member has been advised to seek the advice of independent legal counsel; and

c.      each Member has had the opportunity to seek the advice of independent legal counsel.

IN WITNESS WHEREOF, the parties hereto make and execute this Agreement as of the date first written above.

**THE COMPANY:**

OWEN MOORE INSURANCE AGENCY, LLC

MEMBERS:

OWEN MOORE AGENCY, INC.

BY: _____
     Randal A. Moore, President

ANCHORED INVESTMENTS, INC.

BY: _____
     Stephen M. Kolaja, President

**MEMBERS:**

OWEN MOORE AGENCY, INC.

BY: _____
     Randal A. Moore, President

ANCHORED INVESTMENTS, INC.

BY: _____
     Stephen M. Kolaja, President

KOLAJA

BY: _____
     Stephen M. Kolaja, personally agrees to be
     bound to the terms of Section 6.3, titled
     "Covenant Not To Compete".

20

# EXHIBIT 2

CONFIDENTIAL
RELEASE AGREEMENT

This Confidential Release Agreement ("Agreement") is entered into by and between Owen Moore Insurance Agency, LLC (the "Agency"), Stephen M Kolaja ("Mr Kolaja'), an individual, and Anchored Investments Inc. ("Anchored")   The Agency is owned by the Owen Moore Agency, Inc. and Anchored pursuant to the terms of a certain Restated Operating Agreement of Owen Moore Insurance Agency, LLC dated January 1, 2016 (the "Operating Agreement").  Mr. Kolaja is an at-will employee of the Agency   The Agency, Mr. Kolaja and Anchored may be referred to in this Agreement as a "Party" or the "Parties.'

     1.    Employment Separation Date  Mr. Kolaja's employment has been terminated effective June 24, 2019 ("Separation Date").

     2.    Consideration.  The Agency has "cause" pursuant to Section 12.4 of the "Operating Agreement to terminate Mr. Kolaja's employment.  In exchange for the covenants and commitments contained in this Agreement, the Agency has elected to terminate Mr. Kolaja's employment without cause.  As a result, the Agency is willing to treat Mr. Kolaja's termination as a termination without cause in accordance with the terms of the Operating Agreement and purchase Anchored Investments Inc.'s Membership interest in the Agency pursuant to Section 12.4 and Sections 12.1 through 12.3 of the Operating Agreement for the total amount of Seven Hundred and Eleven Thousand Eight Hundred and Ninety-One and no/100 Dollars ($711,891.00) (the "Purchase Price").  As a result, and provided Mr. Kolaja meets and continues to honor the conditions contained in this Agreement and the in the Operating Agreement, the Agency will, within sixty (60) days of the Effective Date of this Agreement, begin payment of the Purchase Price in installments as provided for and with interest as provided for in the Operating Agreement

     3.    Waiver and Release.  In exchange for the consideration described above, Mr. Kolaja and Anchored hereby release, waive, and forever discharge the Agency and its successors, and the officers, directors, agents, and employees, both present and former, of the Agency and its successors from all claims, demands, obligations, damages, and liabilities of every kind and nature and from all actions and causes of action which Mr. Kolaja and Anchored may now have or may have or maintain hereafter against the Agency, whether in law or in equity, known or unknown, arising in any way out of his employment with the Agency and/or his separation from employment. The claims that Mr. Kolaja and Anchored are releasing, waiving and forever discharging include, but are not limited to, all of the following:

     (a)    any claims for further compensation, bonuses or benefits from the Agency (including but not limited to any claim for additional separation payments provided for in any employment agreement) except as set forth in this Agreement and except for the purchase price of Anchored's ownership interest in the Agency as provided for in the Operating Agreement;

     (b)    any claims arising out of Mr Kolaja's employment or separation of employment with the Agency;

     (c)    any claims of harassment, discrimination, or of any other kind under any applicable federal statute including but not limited to Title VII of the federal Civil Rights Act of 1964, as amended, the federal Age Discrimination in Employment Act, as amended;

the federal Americans With Disabilities Act, as amended; the federal Family and Medical Leave Act, as amended; the federal Retirement Income Security Act of 1974, as amended, the Older Workers Benefit Protection Act, as amended; any state statute including, but not limited to, the Michigan Elliott-Larsen Civil Rights Act, as amended, the Michigan Persons with Disabilities Civil Rights Act, as amended; and the Michigan Whistleblowers' Protection Act, as amended; and any other federal, state, or local statute, ordinance, order, or regulation;

     (d)    any claim under any contract or agreement including, but not limited to, any employment agreement (except this Agreement), promise or policy and except for the purchase price of Anchored's ownership interest in the Agency as provided for in the Operating Agreement;

     (e)    any claim for violation of any other legal duty or public policy including, but not limited to, common law tort claims such as defamation, invasion of privacy, and intentional infliction of emotional distress; and

     (f)    any claim for attorney fees.

     Mr. Kolaja and Anchored accept the consideration provided for in this Agreement in full satisfaction of all such claims

     Mr. Kolaja is not waiving and releasing his rights under this Agreement or his right to vested benefits to which he may be entitled under the terms of any Agency retirement savings plan applicable to Mr. Kolaja and for which he was eligible prior to the Separation Date.

     Mr. Kolaja recognizes and agrees that the separation of his employment with the Agency is permanent and without expectation of recall or reemployment by the Agency.

     4.    No Admission. This Agreement is not an admission by any party of any violation of law or intention to violate any law.

     5.    Confidentiality of This Agreement and Return of Property and Documents. Mr. Kolaja and Anchored have not divulged and will not divulge the terms or amounts in this Agreement to anyone, except that they may make disclosure to their attorney, financial advisors and immediate family, provided that they agree to keep the terms and amounts in this Agreement confidential and not to disclose them to anyone. In addition, Mr. Kolaja and Anchored may make such disclosure to the United States Internal Revenue Service and its state and local counterparts as is necessary to complete their tax returns and to report their income.

     Mr. Kolaja and Anchored are obligated to return, have returned, or will return prior to the Effective Date, all material related to Mr. Kolaja's employment with the Agency and all property of the Agency in either's possession or control including, without limitation, all Confidential Information, reports, files, memoranda, records, keys, access cards, security passes or badges, computer files or disks and all other physical or personal property which either received, prepared or helped to prepare related to the Agency, together with copies in whatever form. Mr. Kolaja and Anchored will not keep any copies, reproductions, facsimiles or other representations of any information or property in any form whatsoever.

     6.    Continuing Obligations.

2

(a)   Certain Communications.  Mr. Kolaja and Anchored agree not to initiate or join in unfavorable comments about the Agency or its owners, officers, directors, employees and agents, provided that this commitment does not extend to isolated comments not otherwise in violation of Mr. Kolaja and Anchored's commitments to the Agency and that do not damage any of the above persons or entities or bring them into public disrepute.

(b)   Confidential Information.  Mr. Kolaja has been employed by the Agency in a position of great trust and responsibility that gave Mr. Kolaja and Anchored access to information of a confidential nature about the Agency and the officers, owners, clients, and employees of the Agency.  For purposes of this Agreement, the term "Confidential Information" shall include, without limitation, information of a confidential or personal nature or any nonpublic information in any form or medium, relating to the Agency or its officers, directors, owners, clients, and employees, and their respective businesses, assets, performance, products, services, trade secrets, or financial statements.  The Parties acknowledge that the Confidential Information derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use and that reasonable efforts have been made to maintain the secrecy of such Confidential Information.

(c)   Confidentiality Obligation.  In addition to any ethical commitments, statutory and common law obligations, Mr. Kolaja and Anchored may have to keep confidences which shall remain in full force and effect.  Mr. Kolaja and Anchored further covenant and agree to maintain in the strictest confidence and not to publish or disclose any and all Confidential Information, in whatever form and without limitation as to when or how they may have acquired such information  Mr. Kolaja and Anchored agree to keep such Confidential Information confidential at all times and agree to neither disclose, furnish, disseminate, make available or use the Confidential Information for Mr. Kolaja and/or Anchored's own or a third party's benefit nor disclose or communicate such information to any third party, person or entity.

(d)   Exceptions.  The obligations under this section will be perpetual and will in each instance be subject to the qualification that Mr. Kolaja and Anchored will be entitled to disclose information:

i.   if required, but only to the extent required and after reasonable prior notice to the Agency, by applicable laws or governmental order, rules or regulations and provided the Mr. Kolaja and Anchored cooperate fully with the Agency to prevent such disclosures, keep such disclosures to a minimum and secure protective orders or similar arrangements,

ii.   if Mr. Kolaja and/or Anchored reasonably believes that disclosure is necessary, but only to the extent necessary and after reasonable prior notice to the Agency, in any legal proceeding to enforce the disclosing Party's rights against, or to defend against claims made by any person; and

iii.   to Mr. Kolaja and Anchored's attorneys, accountants, or business or financial advisors, provided that such persons are bound to similar obligations of confidentiality by enforceable codes of professional responsibility or agreements with the disclosing Party for the benefit of the other Party.

3

(e)    Trade Secret Immunity Notice.  Mr. Kolaja and/or Anchored shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (i) is made in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney and solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Any individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to his attorney and use the trade secret information in the court proceeding, provided the individual files any document containing the trade secret under seal and does not disclose the trade secret except pursuant to court order.

7.    Covenant not to Compete or Solicit.  Mr. Kolaja and Anchored understand and agree that Mr. Kolaja is and will remain bound by the Covenant Not to Compete contained in Section 6.3 of the Operating Agreement, which shall remain in full force and effect according to its terms.  In addition, in exchange for the consideration contained in this Agreement Mr. Kolaja agrees as follows:

(a)    Covenant not to Compete.  Mr. Kolaja agrees that for a period of one (1) year after the Separation Date, Mr. Kolaja will not directly or indirectly engage in any business or enterprise as a shareholder, member, partner, officer, director, proprietor, employee, consultant, adviser, agent, independent contractor, investor or owner (except Mr. Kolaja shall not be prohibited from owning not more than five percent (5%) of the issued stock of any company traded on a national exchange), in any business or enterprise which is in direct or indirect competition with the Agency in the insurance business, or involving or directly or indirectly related to the subject matter of any Confidential Information of which Mr. Kolaja became aware or to which Mr. Kolaja had access during his employment  The geographic area covered by this covenant not to compete is an area with 75 road miles of any office of the Agency.

(b)    Non-Solicitation of Clients.  Mr. Kolaja agrees that for a period of two (2) years following the Separation Date, Mr. Kolaja will not, directly or indirectly, solicit by mail, phone, personal meeting, social media, electronic communications or any other means, any client who was a client of the Agency or who was contemplating entering into a client relationship with the Agency during the two (2) years immediately preceding termination of Mr. Kolaja's employment with the Agency.  For purposes of this Agreement, "not solicit" means that Mr. Kolaja will not have or engage in any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging, or requesting or responding to any request from, any client to do business with Mr. Kolaja or any third party, nor will Mr. Kolaja, on behalf of himself or any third party accept any business or provide any service to any client.

(c)    Covenant not to Solicit Employees and Others. Mr. Kolaja agrees that for a period of two (2) years After the Separation Date, Mr. Kolaja will not solicit or suggest, or provide assistance to anyone else seeking to solicit or suggest, that any person having or contemplating a vendor, employment, partnership, supplier, dealer, carrier or other business relationship with the Agency terminate or refrain from entering into the relationship, or enter into any similar relationship with anyone else instead of the Agency. Mr Kolaja understands and agrees that for purposes of this Section "not solicit" means

4

that he will not have any contact with any with any vendor, employee, partner, supplier, dealer, or carrier for any business purpose.

      (d)   Restriction from Entering Agency Property.   Mr. Kolaja further understands and agrees that he is not to enter onto any property owned, leased or otherwise in control of the Agency for any purpose at any time.

      (e)   Reasonableness.   Mr. Kolaja acknowledges and agrees that these covenants are reasonable as to both time and extent of geographic and other restrictions, that the provisions of these covenants are reasonable and necessary for the protection of the Agency, and that the violation of these covenants will cause the Agency irreparable harm for which Agency will be entitled to temporary and permanent injunctive relief, money damages, and all related costs and reasonable attorney's fees. If a final judicial determination is made by a court having jurisdiction that the time or territory or any other restriction contained in this Covenant Not to Compete or Solicit is an unenforceable restriction on Mr. Kolaja's activities, the provisions of this Covenant Not to Compete or Solicit shall not be rendered void, but shall be deemed amended to apply as to such maximum time and territory and to such other extent as such court may judicially determine or indicate to be reasonable.

      (f)   Limitations. Mr. Kolaja understands that these covenants are not intended to limit post-termination employment in any industry or for any employer providing a product or service different from the Agency's. Mr. Kolaja acknowledges and represents that Mr. Kolaja has substantial experience and knowledge such that Mr. Kolaja can readily obtain employment which does not violate these covenants.

      (g)   Tolling. Mr. Kolaja agrees that in the event of any breach of any post-employment covenant contained in this Agreement, the period of restraint set forth in these covenants shall be automatically tolled and suspended for the amount of time that the violation continues, and shall recommence thereafter.   Mr. Kolaja agrees that the consideration contained in this Agreement is sufficient consideration for the covenants and commitments contained in this section.

    8.   Period for Review and Consultation. Mr. Kolaja and Anchored affirm that they have consulted with an attorney regarding this Agreement before signing it or waived their right to do so. Mr. Kolaja and Anchored have been given at least twenty-one (21) days to decide whether they want to sign this Agreement. If Mr. Kolaja and Anchored elect to sign this Agreement before expiration of the provided period, they do so voluntarily after consulting with counsel or waiving the right to do so, and intending to waive the balance of the provided period. By signing this Agreement, Mr Kolaja and Anchored acknowledge that they have read this Agreement, understand all of its provisions, and knowingly and voluntarily agree to all of its terms and provisions subject to the period of revocation set forth below. Mr. Kolaja and Anchored agree that any change to this Agreement, whether material or immaterial, will not restart the running of the twenty-one (21) day period provided for in this Agreement.

    9.   Revocation Period. Once Mr. Kolaja and Anchored have signed this Agreement, each may still revoke it for up to and including seven (7) calendar days after they sign it  Such revocation must be in writing and delivered to the Agency prior to the end of the revocation period. This Agreement shall not become effective or enforceable until this seven (7) day period has expired without Mr Kolaja or Anchored having revoked this Agreement (the "Effective Date"). Once this revocation period expires, if Mr. Kolaja and Anchored have not revoked this Agreement,

5

this Agreement will be a binding, non-revocable agreement between the Parties. **By his signature below, Mr. Kolaja certifies that he has not taken any action or engaged in any activity that would be a violation of this Agreement at any time from the date he received this Agreement to the Effective Date of this Agreement.**

10.      Entire Agreement and Governing Law. This Agreement shall be governed by the laws of the state of Michigan.  This Agreement and the applicable terms of the Operating Agreement represent the complete understanding between the Agency and Mr. Kolaja and Anchored and neither Party is relying on any statement other than the provisions of this Agreement. No other promises or agreements shall be binding unless in writing signed by the parties to this Agreement.  This Agreement cancels any prior agreements and contracts between the Agency and Mr. Kolaja and Anchored except for the provisions of the Operating Agreement which by its terms survives termination of Mr. Kolaja's employment and the Covenant not to Compete contained in the Operating Agreement and any provision of the Operating Agreement incorporated into this Agreement which shall remain in full force and effect

11.      Section 409A Compliance. Any reference to termination of employment shall be interpreted to require a "Separation From Service" as defined under Treasury Regulation § 1.409A-1(h), including the presumptions provided in that section.  This Agreement is intended to either be exempt from or comply with Section 409A and the regulations and guidance promulgated thereunder and shall be interpreted and operated consistently with those intentions.  The times and schedules of payment under this Agreement may not be accelerated or delayed for any reason except as permitted by Section 409A.  In addition to any other restriction in this Agreement, the Agreement may not be amended or terminated except in compliance with Section 409A.

Stephen M  Kolaja

Date:  7-31-19

Anchored Investments Inc.,

Date:  7-31-19

By
Name:  Stephen Kolaja
Its:  President

Owen Moore Insurance Agency, LLC

Date:  7/31/19

By  Randal A Moore
Name:  Randal A Moore
Its:  Member

6